UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ADAM J. STARKE, individually and on behalf of
all others similarly situated,

                            Plaintiff,

       -against-

SQUARETRADE, INC.,

                            Defendant.
----------------------------------------------------------------X

**MEMORANDUM & ORDER**

16-CV-7036 (NGG)

NICHOLAS G. GARAUFIS, United States District Judge.

In this putative class action, Plaintiff Adam Starke alleges that Defendant SquareTrade engaged in fraudulent and unfair business practices in connection with its protection plans for consumer goods. (Compl. (Dkt. 1).) Pending before the court is SquareTrade's motion to compel arbitration and stay the action (the "Motion"). (Def. Mot. (Dkt. 29).) SquareTrade seeks to enforce an arbitration provision that first appeared in a "terms and conditions" document provided via hyperlink in an email confirming Starke's purchase of a SquareTrade protection plan on amazon.com ("Amazon"). For the following reasons, the court DENIES SquareTrade's Motion.

**I. BACKGROUND**

    **A. Starke's Allegations**

SquareTrade markets, sells, and administers extended warranties, service contracts, and accident protection plans for consumer products, including household appliances and electronic devices. (Compl. ¶ 18.) SquareTrade has sold its protection plans to "over 25 million customers . . . through a number of major retailers, such as [Amazon], Costco, Sam's Club, Target, Staples, Office Depot and Toys 'R' Us." (Id. ¶¶ 19-20.) Starke alleges that SquareTrade

1

relies on several deceptive practices in connection with the sale of its protection plans on Amazon, with the result that consumers are often unaware of terms and conditions that would restrict their coverage and limit their available remedies. (See id. ¶¶ 31-49.) Most relevant for Defendant's Motion is an arbitration provision that appeared for the first time in a set of post-sale terms and conditions. (See id. ¶¶ 41-42.)

Starke's individual claims arise out of a SquareTrade 2-Year Electronics Protection Plan (the "Protection Plan") purchased through Amazon on January 5, 2016. (Starke Decl. (Dkt. 30-1) ¶ 5.) Starke purchased the Protection Plan to cover a CD player that he ordered from Staples on December 27, 2015. (Id. ¶ 3.)

1. The Amazon Purchase Page

The Amazon product page (the "Purchase Page") for the Protection Plan contains several disclosures in the area of the screen next to the "Add to Cart" button a consumer would click to purchase the plan. (Purchase Page (Dkt. 30-2 at ECF pp.19-22) at ECF p.19.) In addition to the price, the disclosures provide as follows:

- Coverage for product breakdowns and malfunctions
- 24/7 customer support
- Free shipping on all repairs with no deductibles or hidden fees
- Fully transferable with gifts. Cancel anytime, full refund in the first 30 days
- If you purchase this service plan and eligible product for this service plan, you acknowledge that Amazon may send the service plan seller relevant product and price information for the purpose of administering the plan

**\*Please note**: Your Service Contract will be delivered via email and not mailed to you. It will come from Square Trade Warranty Services (warrantysupport@squaretrade.com) within 24 hours of purchase. If you don't receive it, please visit **www.squaretrade.com/help.**

(Id.)

Several screens further down on the Purchase Page, under a section called "Things to know," the first bullet point reads: "SquareTrade Protection Plans are only valid for new products <u>purchased at Amazon</u> within the last 30 days." (<u>Id.</u> at ECF p.20 (emphasis added).) Starke alleges that he was unaware that the Protection Plan he purchased did not cover items purchased through retailers other than Amazon. (Starke Decl. ¶ 5.) He believed that he was purchasing a valid plan to protect the CD player he ordered days earlier from Staples. (See <u>id.</u>)

Still further down on the Purchase Page, in a section called "Product information," under the heading "Technical Specifications," is a blue hyperlinked word: "Warranty." (Purchase Page at ECF p.20.) Starke did not click the "Warranty" hyperlink. (Starke Decl. ¶ 6.) Had he done so, he would have accessed a document previewing the terms and conditions (the "Pre-Sale T&C") governing the Protection Plan.[1] (<u>Id.</u>; <u>see also</u> Pre-Sale T&C (Dkt. 1 at ECF pp.33-34).) The Pre-Sale T&C do not mention arbitration. (<u>See</u> Pre-Sale T&C.) SquareTrade admits that, as a result of this lawsuit, it discovered that, at the time of Plaintiff's purchase, the Pre-Sale T&C available on the Amazon Purchase Page were outdated.[2] (Saram Decl. (Dkt. 29-3) ¶ 3; Def. Mem. in Supp. of Def. Mot. ("Def. Mem.") (Dkt. 29-1) at 5.)

2. The Confirmation Email

On January 5, 2016, the day Starke purchased the Protection Plan, he received an email (the "Confirmation Email") from purchaseconfirmation@squaretrade.com with the subject line: "SquareTrade Protection Plan on Amazon.com – Contract is Enclosed." (Confirmation Email

---

[1] The first two lines of the Pre-Sale T&C read: "Congratulations on purchasing this Protection Plan. Please read these terms and conditions carefully so that you fully understand your coverage under this Protection Plan." (Pre-Sale T&C (Dkt. 1 at ECF pp.33-34) at ECF p.33.)

[2] SquareTrade's Director of Growth and Strategy declared that upon discovering the mistake he instructed Amazon to update the hyperlink on its product page to link to the current terms and conditions; he believes this correction was made. (Saram Decl. (Dkt. 29-3) ¶ 3.) Starke contends that Amazon still provided pre-sale terms without an arbitration provision for an entire line of SquareTrade Protection Plans, as of the filing of his brief. (Pl. Mem. in Opp'n to Def. Mot. (Dkt. 30) at 6 n.2.)

3

(Dkt. 30-1 at ECF p.10).) The Confirmation Email had no attachments. (Id.) The Confirmation Email began:

> Thank you for purchasing your new Electronics item protection plan. You're all set! If you'd like to manage your SquareTrade account online, just click the link below.
>
> **IMPORTANT:** You'll need your receipt to file a claim. Submit your receipt now, and we'll keep track of it for you.

(Id.) Starke immediately sent SquareTrade a copy of the receipt, which clearly indicated that the CD player was purchased at Staples. (Starke Decl. ¶ 11.) Two days later, SquareTrade confirmed that it had received the copy of his receipt. (Id. ¶ 12.)

Below the "Thank you" text described above, the body of the Confirmation Email was introduced with the heading "Your Protection Plan." This section contained a summary chart that listed plan details including: Coverage Amount, Protection Plan Price, Coverage Type, Covered Product, Deductible, Quantity, Coverage Term, Coverage Start Date, Coverage End Date, and Waiting Period. (Confirmation Email.)

At the bottom of the Confirmation Email, the phrase "Terms & Conditions" appeared as a blue hyperlink. (Id.) This text linked to a set of post-sale terms and conditions (the "Post-Sale T&C") that Starke characterizes as significantly more restrictive than the Pre-Sale T&C. (Compl. ¶¶ 39-41; see also Post-Sale T&C (Dkt. 1 at ECF pp.36-46).) In particular, the Post-Sale T&C include a provision (the "Arbitration Provision") purporting to bind the parties to arbitration of "[a]ny controversy or claim arising out of or relating to this Protection Plan, or breach thereof . . . in accordance with the Commercial Arbitration Rules of the American Arbitration Association." (Compl. ¶ 42; Post-Sale T&C § 15.) The Post Sale T&C also contain a class action waiver and a California choice-of-law clause. (Post-Sale T&C § 15.) None of

these three provisions appear in the Pre-Sale T&C, nor are they referenced in the body of the Confirmation Email. (See Pre-Sale T&C; Confirmation Email.)

Starke "did not click on the hyperlink to the Post-Sale T&C, did not read the Post-Sale T&C, and was unaware that it or any other document ever received from SquareTrade contained an arbitration provision or class action waiver." (Starke Decl. ¶ 9.)

### 3. Starke's Claim Under the Protection Plan

In October 2016, Starke's CD player required repair or replacement. (Id. ¶ 13.) He made a claim for coverage under the Protection Plan, which SquareTrade denied. (Id.) A SquareTrade Customer Care Specialist told Starke via email on October 20, 2016, that his Protection Plan was invalid because the CD player was not purchased at Amazon. (Rejection of Claim Email (Dkt. 30-1 at ECF p.13).) The Customer Care Specialist told Starke that the Protection Plan could only be canceled "for a full refund as an exception" as opposed to a prorated refund. (Id.)

### B. Starke's Causes of Action

Starke initiated this action on December 21, 2016, asserting three putative class claims. (Compl. ¶¶ 92-110.) First, Starke asserts that SquareTrade violated New York's laws prohibiting deceptive acts and practices, N.Y. Gen. Bus. Law §§ 349-50, by failing to reveal material facts about its protection plans. (Id. ¶¶ 92-98.) Second, Starke asserts a claim under the federal Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 et seq., based on SquareTrade's failure to provide "full, clear and conspicuous disclosure of [the] terms and conditions" of the Protection Plans prior to purchase. (Id. ¶¶ 99-107.) Third, Starke contends that it would be inequitable, under the doctrine of unjust enrichment, to allow SquareTrade to retain profits traceable to its alleged misrepresentations. (Id. ¶¶ 108-10.)

## II. DISCUSSION

SquareTrade seeks to enforce the Arbitration Provision contained in the Post-Sale Terms and Conditions for the Protection Plan. Because the transaction at issue is centered in New York, the court applies New York law. The court finds that SquareTrade failed to establish (1) that Starke had actual knowledge of the Arbitration Provision in the Post-Sale T&C, or (2) that Starke had reasonable notice of the Arbitration Provision and offered an objective manifestation of assent to the Protection Plan's terms. Therefore, the court will not enforce the Arbitration Provision. Because the court finds that there was no enforceable agreement to arbitrate, the court need not, at this time, assess the scope of the Arbitration Provision or the validity of the class-action waiver.[3] The Motion is denied in its entirety.[4]

### A. Choice of Law

#### 1. Legal Standard

"Whether or not the parties have agreed to arbitrate is a question of state contract law." Schnabel v. Trilegiant Corp., 697 F.3d 110, 119 (2d Cir. 2012). "In determining which state law controls, the Court applies the choice-of-law rules of the forum state."[5] Hines v. Overstock.com,

---

[3] SquareTrade argues that the scope of the Arbitration Provision covers the claims at issue and, furthermore, that questions of scope must be resolved by an arbitrator in the first instance because the language of the Arbitration Provision "constitutes the requisite 'clear and unmistakable evidence' that the parties intended the arbitrator to answer questions of arbitrability." (Def. Mem. at 13-14 (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943-47 (1995).) SquareTrade also argues that the terms of the Arbitration Provision require arbitration on an individual basis because they include a class-action waiver that reads: "We also agree not to participate as a class representative or class member in any class action litigation, any class arbitration or any consolidation of individual arbitrations against each other." (Id. at 9 (citing Post-Sale T&C § 15).) These issues are not relevant to the preliminary question of whether Starke agreed to the Arbitration Provision. Because the court determines that he did not so agree, it is not necessary to address the Arbitration Provision's scope or consequences.

[4] SquareTrade sought an order (1) directing that Plaintiff's claims be arbitrated on an individual basis and (2) staying this action pending the conclusion of any arbitration. (See Def. Mem. at 1, 16-18.)

[5] Hines's choice-of-law analysis draws on Second Circuit precedent holding that "'a federal court sitting in diversity jurisdiction[]' ... is obligated to 'apply the [choice-of-law rules] of the forum state.'" Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) (emphasis added) (quoting Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 393 (2d Cir. 2001)); see also Thea v. Kleinhandler, 807 F.3d 492, 497 (2d Cir. 2015); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). In this case, Starke asserts federal jurisdiction on diversity grounds under 28 U.S.C. § 1332(d), and also under 28 U.S.C. § 1337 based on the argument that the Magnuson-Moss Warranty Act is an "Act of Congress regulating commerce." (Compl. ¶¶ 12-13.)

Inc., 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009), aff'd, 380 F. App'x 22 (2d Cir. 2010) (citing Cap Gemini Ernst & Young, U.S., LLC. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003)). In contract cases where there is no applicable choice-of-law clause, courts in New York apply a "center of gravity" approach. Brink's Ltd. v. S. Afr. Airways, 93 F.3d 1022, 1030 (2d Cir. 1996), cert. denied, 519 U.S. 1116 (1997) (citing In re Allstate Ins. Co. and Stolarz, 613 N.E.2d 936, 940 (N.Y. 1993)); see, e.g., Mumin v. Uber Tech., Inc., — F. Supp. 3d —, No. 15-CV-7387 (NGG) (JO), 2017 WL 934703, at *7 (E.D.N.Y. Mar. 7, 2017).

2. Application

The Post-Sale T&C include a California choice-of-law provision. (Post Sale T&C § 15.) However, "[a]pplying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established." Schnabel, 697 F.3d at 119. At this stage, the court will not give effect to a choice-of-law clause contained within the very contractual provisions whose validity is presently being adjudicated.[6]

The court, therefore, must locate the contract's "center of gravity" by considering "the place of contracting, the places of negotiation and performance, the location of the [contract's] subject matter, and the domicile or place of business of the contracting parties." Brink's, 93 F.3d

---

In some "cases arising under [] federal statutes," the Second Circuit has "applied a federal common law choice of law rule." Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 12 (2d Cir. 1996) (internal quotation marks and citations omitted). However, "the Supreme Court has cautioned that it is appropriate for courts to apply federal common law in only a 'few and restricted' instances." Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp., 502 F.3d 78, 80 (2d Cir. 2007) (quoting O'Melveny & Myers v. FDIC, 512 U.S. 79, 87 (1994)). The court will therefore apply state choice-of-law rules. The court recognizes, moreover, that federal and state choice-of-law rules would likely produce the same outcome. "[W]hen conducting a federal common law choice-of-law analysis, absent guidance from Congress, [courts] may consult the Restatement (Second) of Conflict of Laws." Id. (citing Pescatore, 97 F.3d at 12). The Restatement provides that, in the absence of a choice-of-law provision, the validity of a contract is to be decided pursuant to the local law of the state in which the services are to be rendered, or which "has the most significant relationship to the transaction and the parties." Restatement (Second) of Conflict of Laws §§ 188, 196 (1971). For purposes of this case, the Restatement's approach appears similar to New York's "center of gravity" approach, as described in the text.

[6] In any event, a recent decision from this court concluded that New York and California law are "substantively similar with respect to the issue of contract formation." Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 388 (E.D.N.Y. 2015).

at 1030-31 (citing In re Allstate, 613 N.E.2d at 940). Here, the places of contracting, negotiation, and performance are either online, unknown, or non-existent. SquareTrade is domiciled in Delaware, where it is incorporated, and in California, where it has its principal place of business. (Compl. ¶ 17.) The subject matter of the contract and Starke's domicile favor application of New York law: Starke is a resident of Brooklyn, New York, and purchased the Protection Plan to cover a CD player in New York. (Id. ¶¶ 15, 69-70.) The court finds that the "center of gravity" approach favors New York law. Moreover, the parties both applied New York law in their motion papers without briefing choice-of-law issues.

### B. Legal Standards

#### 1. Motions to Compel Arbitration

The Federal Arbitration Act ("FAA") provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA has been interpreted as a "federal policy favoring arbitration" and requiring federal courts to "rigorously enforce agreements to arbitrate." Mumin, 2017 WL 934703, at *7 (quoting Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220, 226 (1987)). Even so, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (internal quotation marks and citation omitted).

In adjudicating a motion to compel arbitration, "a court must begin by answering two questions: '(1) whether the parties agreed to arbitrate, and if so, (2) whether the scope of that agreement encompasses the asserted claims.'" Hines, 668 F. Supp. 2d at 366 (quoting Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289, 294 (2d Cir. 1999)). "The party seeking arbitration has the burden of establishing an agreement to arbitrate." Resorb

8

Networks, Inc. v. YouNow.com, 30 N.Y.S.3d 506, 510 (N.Y. Sup. Ct. 2016) (citing Seneca Ins. Co. v. Secure-Southwest Brokerage, 741 N.Y.S.2d 690 (N.Y. App. Div. 2002); Allstate Ins. Co. v. Roseboro, 667 N.Y.S.2d 914 (N.Y. App. Div. 1998)).

For motions to compel arbitration, the court applies a "standard similar to that applicable for a motion for summary judgment." Mumin, 2017 WL 934703, at *7 (quoting Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). "Therefore, courts must 'consider all relevant, admissible evidence submitted by the parties.'" Id. (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002)). In considering the evidence, "the court must draw all reasonable inferences in favor of the non-moving party." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016). If there is a genuine dispute of material fact regarding the making of an agreement to arbitrate, then a trial is necessary. Bensadoun, 316 F.3d at 175 (citing 9 U.S.C. § 4). If, however, the relevant facts are uncontroverted, the court may rule as a matter of law. See Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 27-28 (2d Cir. 2002); see also Schnabel, 697 F.3d at 128.

2. Common-Law Contract Principles

Fundamentally, "arbitration is simply a matter of contract between the parties." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995). "To create a binding contract" under New York law, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." Express Indus. & Terminal Corp. v. N.Y. Dep't Transp., 715 N.E.2d 1050, 1053 (N.Y. 1999).

Internet commerce "has not fundamentally changed the principles of contract." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004) (applying New York law); see, e.g., Stonehill Capital Mgmt., LLC v. Bank of the West, 68 N.E.3d 683, 689 (N.Y. 2016). The rise of electronic contracts of adhesion and passive online contracting suggest that modern

9

consumer contracting has departed somewhat from the ideal of fully informed assent.[7] In an opinion by then-Judge Sonia Sotomayor, the Second Circuit emphasized that "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." Specht, 306 F.3d at 35. Since that decision, New York courts analyzing online contract formation have applied Specht's requirements of reasonable notice and manifestation of assent. See e.g., Jesmer v. Retail Magic, Inc., 863 N.Y.S.2d 737, 745-46 (N.Y. App. Div. 2008) (finding digital license agreement unenforceable when it never appeared on plaintiff's computer screen and plaintiff never expressly agreed to it); Jerez v. JD Closeouts, LLC, 943 N.Y.S.2d 392, 398 (Nassau Dist. Ct. 2012) (finding terms unenforceable because they were "buried" and "submerged" on a webpage only accessible through an inconspicuous hyperlink).

In Berkson v. Gogo LLC, 97 F. Supp. 3d 359 (E.D.N.Y. 2015), District Judge Jack B. Weinstein surveyed the case law and empirical research on online contracting, then derived a test for determining the enforceability of electronic adhesion contracts. Id. at 402-03. This test operationalizes the requirements of reasonable notice and objective manifestation of assent by directing courts to assess four factors:

(1) Is there substantial evidence that the consumer "was aware she was binding herself to more than an offer of services or goods in exchange for money?" If not, the terms "should not be enforced against the purchaser."

(2) Did the "design and content" of the electronic communication make the terms "readily and obviously available?" If not, the terms should not be enforced against the purchaser.

(3) "Was the importance of the details of the contract obscured or minimized by the [] manifestation of assent expected" to purchase the service? If so, the terms should not be enforced against the purchaser.

---

[7] See, e.g., Jonathan A. Obar & Anne Oeldorf-Hirsch, The Biggest Lie on the Internet: Ignoring the Privacy Policies and Terms of Service Policies of Social Networking Services (Aug. 4, 2016) (unpublished working paper) (available at http://ssrn.com/abstract=2757465) (reporting that 74% of study participants did not read privacy policy and 100% agreed to terms of service requiring payment in the form of a first-born child).

(4) "Did the merchant clearly draw the consumer's attention to material terms that would alter what a reasonable consumer would understand to be her default rights," such as the ability to "bring a civil consumer protection action . . . in the courts in her state of residence"? If not, such terms should not be enforced against the purchaser.

Id. at 402. The Berkson test has been favorably cited and applied by federal and state trial courts. See, e.g., Applebaum v. Lyft, Inc., No. 16-CV-7062 (JGK), 2017 WL 2774153, at *6 (S.D.N.Y. June 26, 2017); Meyer v. Kalanick, 200 F. Supp. 3d 408, 416-21 (S.D.N.Y. 2016); Resorb Networks, 30 N.Y.S.3d at 511; see also Kai Peng v. Uber Tech., Inc., — F. Supp. 3d —, No. 16-CV-545 (PKC) (RER), 2017 WL 722007, at *9 (E.D.N.Y. Feb. 23, 2017) (distinguishing Berkson); Nancy S. Kim, Online Contracting, 72 Bus. Law. 243, 243 (2017) (citing Berkson as evidence that "courts are taking a more sophisticated approach to assess what conspicuous notice means in the online context").

### C. Analysis

Starke declares, and SquareTrade does not dispute, that he never accessed or viewed any version of a "terms and conditions" document from SquareTrade that contained an arbitration provision. (Starke Decl. ¶¶ 6, 9.) Drawing all reasonable inferences in favor of Starke, see Nicosia, 834 F.3d at 229, the court concludes that Starke did not have actual notice of the Arbitration Provision. In the absence of actual notice, the court applies the Berkson test to determine whether Starke is nonetheless bound by the Arbitration Provision. The court finds that SquareTrade's interactions with Starke failed to satisfy the Berkson analysis, and that the Arbitration Provision is therefore not enforceable against Starke.

#### 1. Awareness of Contract

The first Berkson prong asks whether Starke was "aware [he] was binding [himself] to more than an offer of services or goods in exchange for money." Berkson, 97 F. Supp. 3d at 402. SquareTrade points out that Starke's "purchase of a SquareTrade Plan was itself the purchase of

11

a contract." (Def. Reply in Supp. of Def. Mot. ("Def. Reply") (Dkt. 31) at 3.) SquareTrade argues that Starke therefore had reasonable notice of forthcoming contractual terms because Starke "set out to purchase a contract . . . and in fact purchased and received that contract." (Id. at 4 (footnote omitted).) The court agrees. This factor alone, however, does not dispose of the outcome. The first Berkson factor considers whether the consumer was aware of the existence of any contractual terms; the remaining three factors require a more nuanced determination of which contractual terms the consumer could reasonably be expected to discern and agree to. Those factors suggest a finding that, though Starke knowingly entered into a contract with SquareTrade, the Arbitration Provision was not part of that enforceable agreement.

2. Design and Content of Communication

The design and content of the Confirmation Email did not make the Post-Sale T&C "readily and obviously available." Berkson, 97 F. Supp. 3d at 402. The Post-Sale T&C were not displayed in the body of the Confirmation Email, and the "Terms & Conditions" hyperlink was inconspicuously placed in small font at the very bottom of the email. (See Confirmation Email.) New York courts have declined to enforce agreements "where the link to the agreement is buried at the bottom of a webpage or tucked away in obscure corners of the website." Resorb Networks, 30 N.Y.S.3d at 511 (internal quotation marks and citations omitted); see also Jerez, 943 N.Y.S.2d at 398 (finding no notice of "submerged" terms on a web page accessible only by clicking on inconspicuous link).

Nothing in the Confirmation Email prompted consumers to look for the Post-Sale T&C or directed consumers' attention to the "Terms & Conditions" hyperlink. On the contrary, the pithy statement "You're all set!" at the top of the Email could have led a reasonably prudent consumer to believe that nothing more was required of them. In two other places in the Confirmation Email, SquareTrade used stylistic methods to draw attention to certain features: the

12

word "IMPORTANT" appeared in all caps and bold font to prompt consumers to upload their receipt, and a bright red box framed the phrase "WRITE A REVIEW" to solicit reviews of SquareTrade's Protection Plans on Amazon. No such frills adorned the "Terms & Conditions" hyperlink; its placement and formatting made it is easy to miss, even for a consumer who was looking for it. Compare, e.g., Berkson, 97 F. Supp. 3d at 404 ("The hyperlink to the 'terms of use'" was not "readily and obviously available" because it "was not in large font, all caps, or in bold," whereas "the 'SIGN IN' button [was] very user-friendly and obvious, appearing in all caps, in a clearly delineated box in both the upper right hand and the lower left hand corners of the homepage."), with Kai Peng, 2017 WL 722007, at *9 (finding that the business "drew [] attention to the terms of the Service Agreement with bold, capitalized statements").

SquareTrade argues that Starke had reasonable notice of how and when terms would become available because of a disclosure on the Purchase Page instructing that the "Service Contract will be delivered via email . . . within 24 hours of purchase." (Def. Mem. at 1; Purchase Page; see also Def. Reply at 5 (making a similar argument with regard to subject line of the Confirmation Email and a separate confirmation email sent by Amazon).) It was entirely reasonable, however, for Starke to assume that the text of the Confirmation Email constituted the anticipated Service Contract. As Starke points out, neither the Purchase Screen nor any post-sale communication specifically directed his attention to the "Terms & Conditions" hyperlink. (Pl. Mem. in Opp'n to Def. Mot. (Dkt. 30) at 3-4, 16; see also Confirmation Email.) Thus, the disclosure did not provide effective notice of—or legitimately incorporate—the Post-Sale T&C by reference. See Cooperativa Agraria Indus. Naranjillo Ltda. v. Transmar Commodity Grp., No. 16-CV-3556 (LLS), 2016 WL 5334984, at *4-5 (S.D.N.Y. Sept. 22, 2016) (finding incorporation ineffective where documents were titled in confusing manner and reference

13

language "did not reveal the existence of an arbitration provision"); Torres v. Major Auto. Grp., No. 13-CV-0687 (NGG) (CLP), 2014 WL 4802985, at *7 (E.D.N.Y. Sept. 25, 2014) ("[T]he agreement must specifically reference and sufficiently describe the document to be incorporated.").

### 3. Manifestation of Assent

SquareTrade did not require any affirmative manifestation of agreement to its Post-Sale T&C. The importance of the details of the contract were "obscured" and "minimized" by the lack of a clear manifestation of assent required to complete the transaction. Berkson, 97 F. Supp. 3d at 402.

SquareTrade argues that post-sale delivery of service contracts, such as the Protection Plan, is "expressly authorized" under New York law. (Def. Reply at 3 n.2 (citing N.Y. Ins. Law §§ 7901 et seq.).) Even if SquareTrade is correct, however, the legality of post-sale delivery of terms for service contracts, as a general matter, would not automatically vindicate all post-sale terms irrespective of how they were phrased or delivered.

SquareTrade asserts that the Arbitration Provision is binding on Starke because he had "express notice that, if he changed his mind and did not wish to purchase the Plan (because of the [Arbitration Provision] or for any other reason), he could have cancelled the Plan for a full refund within the first 30 days." (Def. Mem. at 2-3.) This argument is unsound because the "duty to read" principle "[does] not nullify the requirement that a consumer be on notice of the existence of a term before he or she can be legally held to have assented to it." Schnabel, 697 F.3d at 110. Furthermore, "[i]n order to constitute acceptance, the failure to act affirmatively must carry a significance that reasonable people in the parties' positions would understand to be assent." Id. at 128. Starke was unaware of the Post-Sale T&C and did not have

14

a meaningful opportunity to review them, and so failing to cancel the Protection Plan cannot constitute assent to the Arbitration Provision.

Finally, SquareTrade argues that "SquareTrade's post-sale delivery of the governing Terms and Conditions could not have come as a surprise" given that Starke "previously had made six other SquareTrade Protection Plan purchases on Amazon." (Def. Mem. at 12; see also Su Decl. (Dkt. 29-2) ¶¶ 9-15.) This argument is unavailing, however, due to the lack of evidence that Starke was ever, in any of his interactions with SquareTrade, given clear notice of the full set of post-sale terms and conditions, or of any pre- or post-sale terms that contained a mandatory arbitration provision. Compare Register.com, 356 F.3d at 401 (finding a binding agreement where "Verio was daily submitting numerous queries, each of which resulted in its receiving notice of the terms," and where "Verio admits that it knew perfectly well what [the] terms [] demanded"), with Specht, 306 F.3d at 35 (declining to enforce an arbitration provision because "a reasonably prudent offeree in plaintiffs' position would not have known or learned, prior to acting on the invitation to download, of the reference to [the] license terms hidden below the 'Download' button on the next screen").

4. Attention to Material Terms

SquareTrade did not "clearly draw the consumer's attention" to the Post-Sale T&C in general or to the Arbitration Provision in particular, a term that alters the "default right[]" to initiate a civil action in a consumer's state of residence. Berkson, 97 F. Supp. 3d at 402. The Confirmation Email summarized several key provisions of the Protection Plan, but neither that email, nor the Purchase Page, nor any other communication from SquareTrade called attention to the limitation on remedies buried in the Post-Sale T&C.

\* \* \*

In sum, it cannot be said that SquareTrade provided reasonable notice and secured Starke's assent to the Post-Sale T&C or to the Arbitration Provision contained therein. SquareTrade mistakenly provided outdated Pre-Sale T&C, which did not include the Arbitration Provision. SquareTrade notified consumers of a post-sale "Service Contract," but never directed them to examine the "Terms & Conditions" document tucked away in a hyperlink at the bottom of the Confirmation Email, which could itself be reasonably mistaken as providing the Service Contract's terms. SquareTrade did not require any affirmative manifestation of assent to the Post-Sale T&C. These choices, taken together, compel the court to find that SquareTrade failed to establish an enforceable arbitration agreement with Starke. Therefore, Starke may not be compelled to arbitrate his claims against SquareTrade.

### III. CONCLUSION

For the reasons state above, SquareTrade's motion to compel arbitration and stay the action (Dkt. 29) is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
August 2, 2017

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge

16